IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

**IN ADMIRALTY**

| | | |
|---|---|---|
| BAE SYSTEMS NORFOLK SHIP REPAIR INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| THE UNITED STATES OF AMERICA, through the DEPARTMENT OF THE NAVY, and its activity, the Mid-Atlantic Regional Maintenance Center | ) | |
| | ) | |
| | ) | |
| | ) | VERIFIED COMPLAINT |
| | ) | |
| Defendant. | ) | |
| | ) | |

For its Complaint against the United States of America, acting through the Department of the Navy, Mid-Atlantic Regional Maintenance Center (the "Defendant" or "Navy"), Plaintiff BAE Systems Norfolk Ship Repair Inc. ("BAE NSR") states:

**NATURE OF THE ACTION**

1. This is a civil action brought by BAE NSR under the Contracts Disputes Act of 1978, 41 U.S.C. §§7101, *et seq.* because the Navy refuses to pay BAE NSR—and its subcontractors Accurate Marine Environmental ("AME") and Surface Technologies Corporation ("STC" and together, "Subcontractors")—money they are rightfully owed for work the Navy cannot dispute they performed.[1]

2. BAE NSR is a leading provider of emergency and planned ship repair, modernization, and overhaul services for commercial and military customers. BAE NSR has

---

[1] BAE NSR is sponsoring its Subcontractors' claims under the Contract Disputes Act.

contracted with, and provided these services to the Navy, which is its primary customer for more than 50 years.  And BAE NSR uses subcontractors like AME and STC to help provide these services to the Navy.

3.     One such contract—and the one at issue here—concerns the USS BATAAN (LHD-5) (the "BATAAN" or "Ship").  The BATAAN is a multipurpose amphibious assault ship. Although the Navy can use the Ship for non-combatant evacuation and other humanitarian missions, the BATAAN's primary mission is to enable the Navy and the U.S. Marine Corps to accomplish a transition seamlessly from the sea to a land battle.

4.     The Navy scheduled the BATAAN for repair, maintenance, and systems alterations to update and improve the Ship's military and technical capabilities in September 2017.  BAE NSR competed for and was awarded Contract No. N00024-16-D-4411, Delivery Order No. N00024-17-F-4138 (the "Contract") to provide the repairs, maintenance, and systems alterations updates called for in the Contract.  Relevant portions of the Contract are attached as **Exhibit 1**.

5.     BAE NSR and its Subcontractors performed the work specified in the Contract that they could, despite the Navy's inability to perform some of its contractual obligations.  BAE NSR and its Subcontractors also performed additional work not called for under the Contract's original terms, and sometimes had to unnecessarily re-do work for no supportable reason.

6.     Due to the Navy's delays, BAE NSR was unable to complete all of the work required of it by the Contract during the Contract's term, generally known as an Availability.  The Navy, though, told BAE NSR and its Subcontractors to keep working, which they did.

7.     Doing so caused BAE NSR and its Subcontractors to incur certain amounts beyond those provided for in the Contract.  The Navy refused to pay BAE NSR and its Subcontractors for

such work and thus BAE NSR properly submitted to the Navy a Request for Equitable Adjustment ("REA") to obtain the amounts BAE NSR and its Subcontractors are entitled to receive.

8.      The Navy did not respond.  BAE NSR was forced to convert its Request for Equitable Adjustment into a Claim demanding a Contracting Officer's Final Decision for the amounts still owed to it and its Subcontractors for certain work performed after the Contract's term, and the additional work the Contract did not contemplate.

9.      In doing so, BAE NSR followed all the requirements of the Contracts Disputes Act of 1978, 41 U.S.C. §§7101, *et seq.* to seek payment of the additional monies still owed to it and its Subcontractors.  The Navy responded with the Contracting Officer's Final Decision, which refused to pay BAE NSR and its Subcontractors the full amounts they are owed.

10.     By failing to pay BAE NSR and its Subcontractors the amounts demanded in the Claim, the Navy breached the Contract causing BAE NSR and its Subcontractors to suffer damages.  Thus, BAE NSR and its Subcontractors must seek the Court's assistance to do what the Navy should have done in the first instance—pay for the work the Navy does not dispute BAE NSR and its Subcontractors performed.

## **PARTIES**

11.     Plaintiff BAE NSR is a Virginia corporation with its principal place of business located at 750 West Berkley Avenue, Norfolk, VA 23523.

12.     Defendant is the United States of America, acting through the Department of the Navy, Mid-Atlantic Regional Maintenance Center, located at 9727 Avionics Loop, Norfolk, VA 23511.

**JURISDICTION AND VENUE**

13.     Jurisdiction in this Court is proper because (i) this action is a claim for a maritime matter, i.e., a ship repair issue, brought under the Contracts Disputes Act of 1978, 41 U.S.C. §§7101, *et seq.* (the "CDA") arising from the Contract; and (ii) this is an admiralty and maritime claim under Fed. R. Civ. P. 9(h) and brought, in accordance with CDA § 41 U.S.C. §7102(d) for "Maritime contracts" under the Suits in Admiralty Act, 46 U.S.C. §30901, *et seq.*, and the Public Vessels Act, 46 U.S.C. §31101, *et seq.*

14.     Venue is proper in this Court under 28 U.S.C. § 1391 and Local Rule 3(C) because (i) CDA §§ 7102(d) and 7104(b) permits BAE NSR to sue in this United Stated District Court; (ii) BAE NSR repaired the Ship in Norfolk, Virginia but the Navy did not pay BAE NSR and its Subcontractors for all of their services thus the events giving rise to BAE NSR's claims occurred in this Court's District and Division; (iii) BAE NSR resides and has its principal place of business in Norfolk; (iv) the Navy executed the Contract in Norfolk; and (v) the Navy has facilities and a presence in Norfolk.

15.     BAE NSR is properly requesting service under Fed. R. Civ. P. 4.

**FACTUAL BACKGROUND**

A.     **The Contract**

16.     During all relevant times, the BATAAN was located at the Navy's Norfolk, Virginia facility.

17.     The BATAAN was due for scheduled repairs and maintenance in September 2017. The Navy conducted a competitive procurement to select a contractor to work on the Ship.

18.     BAE NSR submitted a competitive proposal for the work.  On September 7, 2017, the Navy awarded BAE NSR the Contract to provide specified work on the BATAAN.  The

Contract was for a firm, fixed price in the amount of $13,496,933, plus options for a potential total of $45,784,320, and a total evaluated price of $51,596,952.

19.     The Contract's original terms required BAE NSR to furnish material, support (including electrical, crane, and rigging), and facilities (except those furnished by the Navy under the Contract's terms) and to provide the management, technical, procurement, production, testing, and quality assurance necessary to prepare and accomplish the repair and alteration of the BATAAN during the original availability, scheduled from November 6, 2017 to July 13, 2018 (the "Original Availability").

20.     The Contract's terms and conditions also include Federal Acquisition Regulation clause 52.243-1, CHANGES-FIXED PRICE ("the Changes Clause"), and Defense Federal Acquisition Regulation Supplement clause 252.217-7003, CHANGES.

21.     As work progressed during the Original Availability, BAE NSR determined that it needed to submit Requests for Contract Change ("RCCs") to address growth and new work needed for the BATAAN. The Contract describes growth and new work as work that BAE NSR needed to perform but was unknown and unknowable until the Ship arrived and the Contract work began.

22.      Almost from the beginning of performance, there was a delay in the Navy's response to, and settlement of, RCCs. Unfortunately, because the Contract was for a firm, fixed price, there was insufficient funds available to the Navy to allow it to authorize/add the growth and new work to the Contract's scope of work. In large part, the Navy's lack of available funding for growth and new work identified during the Original Availability caused many delays.

23.     The Navy used the "upward obligation" process to locate and acquire the additional government funds needed to pay for growth and new work needed on the BATAAN. Each upward obligation is a lengthy process from start to finish and it takes many months for funds for additional

growth and new work to become available.  Because of the resulting delay caused by the upward

obligations process, the Navy extended the Ship's availability four times, from July 13, 2018 to

November 9, 2018 ("the Availability").  During this time, BAE NSR worked diligently to complete

all work on the Ship not otherwise prevented by the Navy.

24.     As the Availability's end date neared, BAE NSR expected that the Navy, as it had

done in the past, would unilaterally extend the Availability again, providing time and the funding

necessary to complete outstanding items.  No extension was granted.  The Contract's Availability

ended on November 9, 2018.

**B.     The Parties discuss the Contract after the Availability ends**

25.     The next day, the Navy issued a letter to BAE NSR claiming BAE NSR to be in

default of the Contract because it had not delivered a "mission ready" ship on November 9 (the

"November 10 Letter").

26.     In the November 10 Letter, the Navy directed BAE NSR "to accomplish all

outstanding contractual requirements" identified in that letter's Enclosure 1 labeled Incomplete

Work/Discrepancy List (the "Discrepancy List").

27.     The November 10 Letter limited BAE NSR's continuing performance to only those

work items called out in the Discrepancy List but omitted several additional work items still

required for a mission-ready ship.  BAE NSR thus sought direction from the Navy about work

scope in its letter dated November 16.

28.     In that letter, BAE NSR explained that it was not in default and BAE NSR detailed

the status of every item on the Discrepancy List.  For nearly all of those items, BAE NSR could

not proceed with its work until the Navy had first completed its own work responsibilities, which

the Navy failed to do.  Of the few other items on the Discrepancy List, BAE NSR had either already

completed them or would complete them by November 29.  BAE NSR provided a timeline for each of the work items, many dating to the Original Availability.

29.     BAE NSR also highlighted two examples in which the Navy had given BAE NSR reason to believe that it would extend the Availability beyond November 9.  Three days before the Availability ended, the Navy issued Reservation Task Request ("RTR") 3166 for Work Item 123-10-001, Tanks and Voids ("Work Item 123-10-001").  This work required around twenty three days to complete, establishing a period of performance through November 29.  The Navy had also issued RTR 3177 for Work Item 631-13-002, Ramp and Sump; Preserve; this work would require until November 15 to complete.  Both of these RTRs required work extending beyond the Contract's Availability.

30.     BAE NSR also notified the Navy that the Navy's continued dumping of liquids into the bilge spaces prevented BAE NSR from completing Work Item 992-31-001, Cleaning and Pumping ("Work Item 992-31-001").  BAE NSR could not finish its work as long as the Navy continued to dump liquids, and BAE NSR's continued efforts to finish Work Item 992-31-001 constituted a Contract change.

31.     BAE NSR's November 16 letter thus notified the Navy that its actions were Contract changes and that BAE NSR was reserving its rights.  The letter also summarized government delay in: (i) obtaining funding through upward obligations, (ii) providing government furnished material, and (iii) completing the scope of work to be performed by the Navy's own personnel ("Ship's Force").  These delays, of more than six months, forced BAE NSR to re-sequence its work, created inefficiencies in the schedule, and caused BAE NSR to incur additional costs.

32.     On November 19, the Navy submitted a revised discrepancy list ("Revised Discrepancy List"), adding six work items, and reminding BAE NSR to complete Work Item 992-31-001 "through completion of the remaining outstanding work items."  The Navy also told BAE NSR to complete Work Item 583-90-001, SCD 75091K Class Boat Davit, Replace ("Boat Davit Work Item").

33.     BAE NSR responded to the Navy's letter on November 21.  BAE NSR questioned the status of the items in the Revised Discrepancy List.  BAE NSR again informed the Navy that it considered the Navy's addition of work after the Availability ended to constitute a contractual change.

**C.     Work on the Ship continues from November 10, 2018 through March 4, 2019**

34.     After the Availability ended, between November 10, 2018 and March 4, 2019, the Navy required BAE NSR to complete certain work items that were in the Contract, but not completed because of the Navy's delays, and to provide expanded effort for work that the Navy requested but had not added to the Contract.

35.     The Navy's directions included changes to itemized work and added work scope. For example, the Navy directed BAE NSR to add multiple pendant and wire installations on the Flight Deck Safety Nets.  This work was outside the Contract's work item specifications.

36.     The Navy also directed BAE NSR to perform work not included in the Revised Discrepancy Lists' work specifications.

37.     As a result, BAE NSR's small business subcontractor, AME, provided additional cleaning, pumping and disposal services under Work Items 992-31-001 and 123-10-001, in direct and required support of the Navy's Contract change.

38.     BAE NSR continued to work on the items identified in the Revised Discrepancy List and completed most of them by December 5, 2018.  The items that BAE NSR had not completed were mainly testing, which could not occur until after the Navy's own personnel had completed its work.  But Ship's Force personnel efforts were often at a standstill because they were on extended leave during the November and December 2018 holidays.

39.     During this time, BAE NSR had superintendents and other personnel in the Project Management Office ("PMO")[2] labor category onboard the BATAAN waiting, idle, for Ship's Force personnel to complete work so that BAE NSR could then complete its testing requirements for certain work items and receive government approval.

40.     Because of the Navy's delays, BAE NSR often needed to adjust work schedules and personnel, incurred lost productivity, and had to be present on the Ship in case Ship's Force personnel became available to test systems repaired on a BAE NSR work item.  As a result, BAE NSR had to incur additional PMO costs.

41.     This lost productivity resulted from the Navy's inability to complete its work on the outstanding work items and to satisfy its contractual obligations.  Ship's Force personnel delayed BAE NSR's ability to complete the Contract and deliver a mission-ready ship.

42.     Despite requiring the foregoing additional and changed work, the Navy never formally amended the Contract.  Thus, the Navy either constructively extended or constructively changed the Contract.  Even so, at the Navy's direction, BAE NSR continued to work and had a

_____

[2] The PMO labor category refers to personnel who perform certain administrative functions, such as Quality Assurance, Environmental, Safety, Medical, Ship Supervision, Contracts, Finance, Planning, Purchasing, and Subcontracts; they are necessary for BAE NSR to perform work during a ship's availability.  BAE NSR develops a daily rate to provide these combined administrative functions and this rate is multiplied by the days these support functions are required for each ship.

right to be compensated—it still does—for the costs to perform the additional work and support the Navy requested.

### D.      BAE NSR requests an equitable adjustment

43.      The Navy refused to pay BAE NSR certain amounts owed for work performed both before and after the Availability ended.

44.      BAE NSR thus submitted a Request for Equitable Adjustment (the "REA") on July 12, 2019, seeking the payment of $1,331,058.

45.      The REA sought fair and reasonable compensation for the PMO costs BAE NSR incurred for the period of December 5, 2018 through March 4, 2019, all of which BAE NSR incurred after the Availability ended.  The REA included examples of delays caused by the Navy, which created the need for BAE NSR to provide continued PMO support.  The specific delays referenced in the REA pertained to several work items, including Work Items 992-31-001 and the Boat Davit Work Item.

46.      BAE NSR was unable to complete some of its Contract work during the Availability, in part, because of the delays associated with the work items discussed in the REA. But to perform this work after the Availability, BAE NSR needed to provide PMO support.  BAE NSR's bid proposal did not include, and the Contract did not provide, an amount to compensate BAE NSR for PMO support provided after the Availability ended.  BAE NSR provided such support.  Yet the Navy refused to pay BAE NSR for those services.

47.      BAE NSR was not the only one the Navy was refusing to pay.  The Subcontractors also provided services not contemplated by the Contract. Thus, to obtain payments owed but not paid to them, the Subcontractors submitted their own Requests for Equitable Adjustments which

were included in BAE NSR's REA.  BAE NSR also requested payment of its mark up for its Subcontractors' REAs.

      **E.**    **AME's request for an equitable adjustment**

48.    In preparing its bid for the BATAAN, AME scrutinized and priced the requirements of Work Items 992-31-001 and 123-10-001.  At the Navy's direction, AME's Work Item 992-31-001 pricing also included service allowances for various work items that would require AME's pumping and removal of system fluids.  AME's bid depended on a start date of November 6, 2017, and a stop date on the Ship's production completion date ("PCD") of May 30, 2018.

49.    AME began work on the BATAAN in November 2017.  During the Original Availability, the Navy identified additional growth and new work and the Navy issued RCCs to cover this work.  AME, through BAE NSR, received the RCCs and priced AME's services for the growth and new work RCC's for Work Items 992-31-001 and 123-10-001, and other work items, through May 30, 2018.

50.    In May 2018, BAE NSR advised AME that the Navy would extend the PCD beyond May 30 due to the late arrival of government furnished materials and the Navy's delays.  AME submitted reports to the Navy and BAE NSR emphasizing that it's pricing of Work Items 992-31-001 and 123-10-001, as well as the other items covered by the Navy's RCCs, had been based on a May 30, 2018 end date.  AME advised the Navy that it would require a RCC for its additional/extended work and services beyond May 30, 2018.

51.    In late June 2018, the Navy issued RCC 525G for the extension and pricing of services to a September 11 end date.  AME submitted its pricing for RCC 525G on July 3, 2018.  Rather than negotiate RCC 525G, the Navy issued Unilateral Contract Modification

A00011.  Unilateral Modification A00011 included $120,000 for AME's extended service charges through September 11, which the Navy paid.

52.     AME acknowledged in its REA submission that the Navy had paid AME $120,000, but stated that amount represented only a partial payment of AME's increased job charges.  AME sought a further equitable adjustment of $261,972.80 for the additional labor hours, material, equipment, and tanker rental charges that it incurred supporting the additional cleaning, pumping, and disposal services provided under Work Items 992-31-002 and 123-10-001, other work items, and the extended RCC 143G charges for the BATAAN from May 31 through September 11.

## F.     STC seeks an equitable adjustment as well[3]

53.     STC was a BAE NSR subcontractor for the Contract under BAE Systems Purchase Order No. 5101348 (the "STC Subcontract").  Under the STC Subcontract, STC was to perform work under various work items, including Work Item 634-21-001, Flight Deck, Catwalk and Platform Nonskid, replace ("Work Item 634-21-001").  Work Item 634-21-001 included the requirements for deck coatings removal, surface preparation, and replacement of deck coatings including nonskid paint.  The STC Subcontract flowed down many terms of the Contract including, without limitation, the specifications and the Changes Clause.

54.     STC fully performed its obligations under Work Item 634-21-001.  On June 18, 2018, STC completed all contracted work for the Ship's Zone #5 ("Zone #5") including steel profiles, primer installation, primer dry film thickness, and nonskid installation.  The appropriate STC quality assurance personnel, BAE NSR, and the Navy completed and approved all required inspections.  STC provided documentation of the inspections.

---

[3] The REA also included requests for other BAE NSR subcontractors.  The Complaint does not include those other subcontractor Requests for Equitable Adjustment or claims.

55.     Ten days later, STC received an engineering service request ("ESR") stating that the Navy was concerned that STC's application of nonskid paint in Zone #5 was questionable because Ship's Force personnel alleged that STC did not thoroughly mix the nonskid paint and that STC employees were "beating the cans on the deck."

56.     Upon information and belief, that Navy crew member alleged that STC did not adequately mix some of the nonskid paint materials to be applied for a full period of sixty seconds. The crew member's allegation did not specify which deck areas STC had painted with the allegedly under-mixed paint or how many cans of nonskid paint were allegedly under-mixed.  Besides the Navy crew member's unsubstantiated personal observation, there was no other evidence of this violation.

57.     Upon information and belief, the Navy crew member alleging this error was not an authorized inspector, had no contractual authority, and could not legally direct work on the Contract or the STC Subcontract.

58.     On June 29, STC denied these allegations, stating that all application complied with Naval Sea Systems Command ("NAVSEA") Standard Item 009-32, paragraph 3.11.7.2.

59.     On July 11, to resolve the Navy's concerns, STC asked the manufacturer's expert to inspect STC's work performed on Zone #5.  After doing so, the expert concluded that the Navy's concern that the nonskid paint would not cure properly was ill-founded and should be of no concern.  STC also issued a letter to the Navy two days later providing a one-year warranty on the nonskid paint.

60.     Despite these assurances, on August 1, the Navy issued a Letter of Direction to BAE NSR stating that the nonskid paint had to be removed and reinstalled because the "nonskid was improperly mixed and [would] not cure thoroughly nor perform for its expected service life."

61. STC requested the Navy reconsider its position, given the many documented sources verifying the sufficiency of STC's work on Zone #5. STC also requested permission to perform other NAVSEA approved tests to verify whether STC applied the nonskid paint in a questionable manner so that the nonskid paint would fail. The Navy agreed to have these tests performed.

62. On October 28, two Certified National Association of Corrosion Engineers ("NACE") inspectors, Reuben Lewis of STC and Morris Williams of Randolph Coatings, along with Stacey Schlosser of ITW Corporation and STC's Vice President, Brian Stump, conducted the NAVSEA approved tests. The NAVSEA tests confirmed STC had properly installed the nonskid paint and there would be no need for removal and reinstallation.

63. On October 30, STC sent Chris Bruckner, the Mid-Atlantic Regional Maintenance Center's engineer, documentation of the NAVSEA approved test results and requested that the Navy reconsider its formal direction to replace the nonskid paint in Zone #5.

64. The next day, Mr. Bruckner again directed BAE NSR to remove and reinstall the nonskid paint for Zone #5. STC complied and performed the removal and reinstallation.

65. As a result of the Navy's direction to STC to remove and reinstall the nonskid paint in a large area of some 7,525 square feet, despite substantial evidence showing STC satisfactorily performed the first installation with no defects or legitimate cause for concern, STC incurred additional costs of $179,000. This includes $64,980 in labor costs and $114,020 in materials costs.

66. Because allegations of defective work are a Navy or Government claim, the Navy has the burden of proving that the work was defective, that it required rework, and that the rework required only covered the amount of work that was allegedly defectively performed. The Navy has met none of these required burdens of proof.

67.     Moreover, the Navy's direction was a change to the Contract and, in not compensating STC for its costs to remove and re-install the nonskid coating, the Navy breached the Changes Clause.

### G.     The Contracting Officer's Final Decision

68.     The REA requested $1,331,058 in damages, which included BAE NSR's damages in the amount of $865,327, AME's damages in the amount of $249,005, and STC's damages in the amount of $179,000.[4]

69.     The Navy ignored the REA and did not pay any of the requested damages.  As a result, on August 30, 2019, BAE NSR converted the REA into a properly certified claim under 41 U.S.C. §7103(b) and 48 C.F.R § 33.207 (the "Claim"), which demanded in writing a sum certain as a matter of right and sought a Contracting Officer's Final Decision.

70.     The Navy responded with its Contracting Officer's Final Decision ("COFD") on February 24, 2020.  The Final Decision arbitrarily denied all but $230,622 of BAE NSR's $1,331,058 claim.

71.     The items addressed in the COFD respond to Section II.D.1 of the REA, labelled "Some Examples of Government-Caused Delay," and to some of the BAE NSR subcontractor costs detailed in the "Quantum" section of the REA, Sections IV.B-IV.D.

72.     The Navy issued the COFD under the Contract.  Of the nine items identified in the REA, the COFD denied four of them (items 1, 2, 5 and 9) in their entirety.  The COFD detailed its position for six of the items as related to delay and three as related to extra work on specific work item issues.

---

[4] The Claim also included $70,716 in additional costs incurred by another subcontractor. Those costs are not part of this Complaint.  *See* Paragraph 88.

73.     Delay item 1 pertains to Work Item 992-31-001.  The COFD determined this work item had not been delayed, and denied this portion of the Claim including BAE NSR's requested PMO costs associated with it.

74.     Delay item 2 relates to the Boat Davit Work Item.  The COFD denied BAE NSR's request for PMO costs related to this item asserting that BAE NSR caused the delay, not the Navy.

75.     Delay item 3 pertains to Work Items 589-11-001, Starboard Sideport Cargo Crane repair, and 589-62-001, Port and Starboard Sideport Shell Door repair.  The COFD concurred with BAE NSR's claim for 13 days of PMO support for the period November 28, 2018 through December 10, 2018, in the amount of $25,305.

76.     Delay item 4 relates to load bank testing equipment.  The COFD agreed to pay BAE NSR for its extended equipment rental costs while the Navy worked through issues stabilizing the steam plant.  Neither the REA nor the Claim requested these costs.

77.     Delay item 5 pertains to Work Item 612-21-001, Aircraft Elevator Platform and Flight Safety Nets; repair.  The COFD found this claim had no merit and denied it in its entirety.

78.     Delay item 6 pertains to light off of the steam boiler.  The COFD agreed that BAE NSR was entitled to PMO costs associated with standing by during the Ship's attempts to light off for the period December 5, 2018 to March 4, 2019.  The COFD agreed to pay $56,535, which covers only 1 superintendent during that timeframe.

79.     Item 7 relates to Work Item 631-21-002, Landing Craft Well Deck Overhead, preserve.  The COFD agreed with this claim and the entire $70,716 amount BAE NSR requested.

80.     Item 8 pertains to the costs AME requested.  The COFD referenced Item 8 as "Work Item 992-31-002, Cleaning and Pumping; accomplish" ("Work Item 992-31-002") and denied AME's portion of the REA.  The COFD notes that the Navy paid AME $120,000 on RCC 525G

and states: "The costs (sic) was based on parametric estimating from the original bid. AME originally bid 7,543 man-hours for six and a half months of cleaning and pumping. Now AME is asking for 7,106 man-hours for three and a half months that is double the amount from the original. The Government offered $119,823 that included labor, rentals and fees but AME denied the offer."

81.     The COFD acknowledges that AME is entitled to additional compensation for the increased pumping, cleaning, transportation, and disposal services it provided, but limits AME's compensation to a partial payment of the extended Work Item 992-31-002 services. The COFD ignored AME's additional services provided under Work Item 123-10-001, the RCC 143 covered support services, and other work items for the entire PCD extension period. AME's extended services were tied directly to the Navy's extension of the PCD. If AME had not provided these pumping, cleaning, and disposal services, the Ship would not have been safe and the Navy's directed repairs could not have been performed.

82.     Rather than compensate AME for its actual job costs from May 31 through September 11, 2018, the Navy extrapolated/used some form of parametric estimating against AME's bid for Work Item 992-31-002 and offered $119,823 to settle AME's charges for that PCD extension. Although the COFD describes the $119,823 as an offer, the Navy included this amount in its Unilateral Contract Modification A00025 ("UCM A00025"), discussed below, without having met or negotiated with AME to reach a final settlement for its claim.

83.     The COFD fails to pay AME the remaining $129,182 in costs for increased labor, equipment, and material charges it incurred in direct support of the Navy's extensions of the PCD from May 31, 2018 through September 11, 2018. The COFD acknowledges that AME was entitled to additional compensation but limited AME's compensation to a partial payment of the extended Work Item 992-31-002 services.

84.     The COFD also denies compensation to STC for Item 9, to remove and re-deck designated areas under Work Item 634-21-001 Flight Deck, Catwalk and Platform, Nonskid, replace.  The COFD denied STC's claim, maintaining that any additional cost incurred using third party testing and for re-application of Zone #5 nonskid paint rests solely on BAE NSR and STC.

85.     In reaching its conclusion stated in the COFD, the Contracting Officer failed to consider that BAE NSR provided substantial documentation supporting the Claim and BAE NSR's efforts to prepare the REA.  The REA focused only on the damages resulting from the Navy's actions and failures to act that led to the costs BAE NSR claimed.

86.     The COFD also denied payment of all BAE NSR burdens, or markups, of overhead and profit on its Subcontractors' claims.

87.     The Navy issued UCM A00025 on March 27, 2020, which included a liability determination and obligated $350,445 in funding to the Contract as stated in the COFD.

88.     The specific items and amounts requested by BAE NSR, agreed to by the Navy in the COFD, and paid for by UCM A00025 are:

| Cost | Amount Sought | Amount Paid | Balance Remaining |
|---|---|---|---|
| PMO for work completed in the delay period, 5 December 2018 – 4 March 2019 | $634,841 | $81,840 | $553,001 |
| Additional work costs | $73,881 | $0 | $73,881 |
| International Marine & Industrial Applicators REA | $70,716 | $70,716 | $0 |
| BAE burden | $17,527 | $0 | $17,527 |
| Accurate Marine Environmental's REA | $249,005 | $119,823 | $129,182 |
| BAE burden | $61,720 | $0 | $61,720 |
| Surface Technologies Corporation's REA | $179,000 | $0 | $179,000 |

| BAE burden | $44,368 | $0 | $44,368 |
|---|---|---|---|
| Preparation Costs | $32,990 | $0 | $32,990 |
| Additional rental costs under Item 4 | $0 | $78,066 | $0 |
| **TOTAL** | **$1,364,048** | **$350,445** | **$1,091,669** |

89.     The $81,840 paid for PMO breaks down to $25,305 for Item 3, and $56,535 for Item 6.

90.     Because the Claim's Quantum[5] did not include the $78,066 payment for rental costs, the total of the original REA minus the amount paid under UCM A00025 does not equal the total balance remaining in the REA.

91.     The COFD was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contract and the relevant law and facts.  For example, the COFD does not address BAE NSR's requested PMO charges or burden amounts for any of its subcontractors' claims; it also does not address BAE NSR's entitlement to REA preparation costs.

92.     The COFD simply ignores the well supported claims asserted by BAE NSR and its Subcontractors.  The Court should not allow the COFD to stand and should require the Navy to compensate BAE NSR and its Subcontractors for the work they performed that Navy refuses to pay for.

---

[5] The "Quantum" is the portion of the REA, incorporated into the Claim, identifying the amounts the Navy owes BAE NSR and its Subcontractors.

93.     As a result of the Navy's unreasonable COFD, BAE NSR seeks to recover these amounts under each of its following theories:

| Cost | Amount Owed |
|------|-------------|
| PMO for work completed in the delay period, 5 December 2018 – 4 March 2019 | $553,001 |
| Additional work costs | $73,881 |
| BAE burden | $17,527 |
| Accurate Marine Environmental's REA | $129,182 |
| BAE burden | $61,720 |
| Surface Technologies Corporation's REA | $179,000 |
| BAE burden | $44,368 |
| Preparation Costs | $32,990 |
| **TOTAL** | **$1,091,669** |

## COUNT I

### DISPUTE UNDER THE CONTRACT—APPEAL OF THE FINAL DECISION

94.     BAE NSR repeats and re-alleges the allegations in all the preceding paragraphs as if fully set forth herein.

95.     BAE NSR and its Subcontractors successfully completed all of the work required under the Contract or requested of them by the Navy, including the many changes directed in writing by the Contracting Officer and accepted by the Navy, and has complied with all prerequisites and conditions precedent for filing this action.

96.     The Contract's terms and conditions include the Changes Clause, which entitles BAE NSR to payment for any changes that cause an increase in the cost of, or the time required

for, performance of any part of the work under the Contract as made in writing by the Contracting Officer.

97.     BAE NSR is also entitled to pass on additional Subcontractor costs and damages due to the Navy's changes that caused an increase in the cost of, or the time required for, performance of any part of the work under the Contract.

98.     The Navy failed to provide the compensation requested by BAE NSR and its Subcontractors for such changes, both directed and constructive, and for such changes in conditions, means and methods of performance, and schedule.

99.     The Navy has failed properly to adjust the Contract for such changes and has failed to negotiate such changes and impacts, and to issue timely extensions in accordance with the Contract and its terms, which are incorporated herein by reference.

100.     As a result of these contractual failures,  BAE NSR and its Subcontractors have a right to recover the entire amount of the incurred damages resulting from the Navy's delays and disruptions in the amount of $ **1,091,669**, plus interest, costs, and fees as may be allowable under applicable Federal Law or such other amount as the evidence may reveal.

101.     BAE NSR seeks the adjustment requested in Count I only as an alternative pleading to the amount sought in Count II and III.

## COUNT II

### BREACH OF CONTRACT

102.     BAE NSR repeats and re-alleges the allegations in all the preceding paragraphs as if fully set forth herein.

103.     BAE NSR and its Subcontractors successfully performed all of their obligations, and have complied with all prerequisites and conditions precedent under the Contract and have a

right to fair and reasonable compensation for their work as an equitable adjustment for the cost of the Navy's changes to the Contract.

104.     Under the Contract, BAE NSR is entitled to payment for any changes in the work scope, means, and methods of performance and government-furnished materials, services, and equipment, and is also entitled to an equitable adjustment for the cost of such changes and expenditures.

105.     Under Federal Acquisition Regulation § 43.204(b)(1), the Navy must negotiate such equitable adjustments under the Contract and settle all outstanding changes in the "shortest practicable time."  The Navy has failed to do so despite knowing BAE NSR and its Subcontractors are entitled to equitable adjustments.

106.     The Navy's failure to pay $**1,091,669** for work successfully completed by BAE NSR and its Subcontractors and accepted by the Navy is a breach of the Contract.

107.     As a result of the Navy's failure to pay BAE NSR and its Subcontractors, the Navy has breached the Contract including, but not limited to, its obligations under the Federal Acquisition Regulations relating to contract performance and settling changes.

108.     The Navy's Contract breaches and failures have damaged BAE NSR in the amount of $**1,091,669**.

109.     The Navy's Contract breach has also damaged BAE NSR causing it to lose the time value of the money that the Navy owes BAE NSR and in having to expend significant amounts of legal and administrative costs to pursue this action.

110.     BAE NSR thus seeks breach of contract damages of $**1,091,669** as explained in the Claim, plus such interest, costs and fees as may be allowable under applicable Federal Law, or such other amount as the evidence may reveal.

111.    BAE NSR seeks the adjustment requested in Count II only as an alternative pleading to the amount sought in Count I and III.

## COUNT III

### QUANTUM MERUIT

112.    BAE NSR repeats and re-alleges the allegations in all the preceding paragraphs as if fully set forth herein.

113.    As explained above, BAE NSR provided additional and/or changed work, and applied additional labor, manpower, materials, subcontractors, and equipment as required to fulfill the Navy's directions (the "Additional Work"), even when those instructions exceeded the Contract's requirements.

114.    If the Court determines that BAE did not perform the Additional Work under the Contract, then BAE NSR seeks to recover under a quantum meruit claim.

115.    The Navy requested BAE NSR and its Subcontractors perform the Additional Work.  But the Navy and BAE NSR and its Subcontractors did not agree on the price the Navy would pay for the Additional Work.

116.    The Navy received the benefit of the Additional Work but has not paid BAE NSR and its Subcontractors for that work.

117.    If the Navy is not required to pay for the Additional Work under the Contract, it would be inequitable for the Navy to benefit from such efforts and expenditures without paying a reasonable or fair value for that work.

118.    The Navy benefited from the Additional Work in the amount of $**1,091,669**.

119.    The Navy should have to pay as quantum meruit damages to BAE NSR and its Subcontractors the amount of $**1,091,669** or such additional amounts as the evidence may reveal.

120.    BAE NSR seeks the amount requested in Count III only as an alternative pleading to the amount sought in Counts I and II.

## PRAYER FOR RELIEF

WHEREFORE, BAE NSR respectfully requests that this Court enter judgment in BAE NSR's favor and against the Navy and award the following relief:

A.    Award BAE NSR $**1,091,669** under the Contract's terms for work successfully completed and accepted;

B.    Award BAE NSR post-judgment and pre-judgment interest as permitted under any applicable legal theory, the Contract, statute, or regulation, including, without limitation, the CDA;

C.    Award BAE NSR its costs and attorneys' fees incurred to the full extent permitted under any applicable legal theory, the Contract, statute, or regulation; and

D.    Grant such other and further relief as the Court deems just and proper to award BAE NSR a complete remedy.

Dated:  September 11, 2020.                    Respectfully submitted,


_/s/ Alex E. Wallin_____
Alex E. Wallin (VA Bar Number 81058)
Taft Stettinius & Hollister LP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 357-9445
(513) 381-0205 (facsimile)
awallin@taftlaw.com

Suzanne Sumner (*pro hac vice motion forthcoming*)
Taft Stettinius & Hollister LP
40 N. Main Street, Suite 1700
Dayton, OH 45423
(937) 641-1752
(937) 228-2816 (facsimile)
ssumner@taftlaw.com

*Counsel for Plaintiff BAE Systems Norfolk*
*Ship Repair, Inc.*

Of Counsel:

Barbara A. Duncombe
Taft Stettinius & Hollister, LP
1 Indiana Square, Suite 3500
Indianapolis, IN 46204
(317) 713-3461
(317) 713-3699 (facsimile)
bduncombe@taftlaw.com

<u>TABLE OF EXHIBITS ATTACHED</u>

Ex. 1:  Excerpts and Text of Contract No. N00024-16-D-4411, Delivery Order No. N00024-17-F-4138.

<u>VERIFICATION</u>:

The undersigned, <u>Tracy Scarboro</u>, Contracts Director of BAE Systems Norfolk Ship Repair, Plaintiff here, hereby certifies that (a) he has read the allegations of the foregoing Complaint and provided legal counsel with the information on which it is based; (b) that to the

best of his knowledge and belief the allegations in the Complaint are accurate and complete; and

(c) that is statement is made under the penalty of perjury in accordance with 28 U.S.C. §1746.

By: _____

Digitally signed by
Tracy Scarboro
Date: 2020.09.08
14:21:49 -04'00'

Tracy Scarboro, Contracts Director
BAE Systems Norfolk Ship Repair

Dated:  September 8, 2020